IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRENT L. ALFORD,

    **Plaintiff,**

    v.                                        CASE NO. 24-3022-JWL

GORDON HARROD, et al.,

    **Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. Plaintiff is a prisoner at the Ellsworth Correctional Facility in Ellsworth, Kansas. The Court granted Plaintiff leave to proceed in forma pauperis. On July 2, 2024, the Court entered a Memorandum and Order (Doc. 8) ("M&O") finding that the proper processing of Plaintiff's claims could not be achieved without additional information and directing Kansas Department of Corrections ("KDOC") officials to submit a *Martinez* Report.

The Court's M&O provided that "[o]nce the Report has been received, the Court can properly screen Plaintiff's claim under 28 U.S.C. § 1915A." (Doc. 8, at 10.) The *Martinez* Report (Doc. 11) (the "Report") has now been filed. This matter is before the Court for screening. The facts and the Court's screening standards are set forth in the Court's M&O.

**I. Nature of the Matter before the Court**

Plaintiff alleges in his Complaint (Doc. 3) that the defendants provided him with inadequate medical care over a period of four years (2017-2021) while he was incarcerated at the El Dorado Correctional Facility ("EDCF"), Lansing Correctional Facility ("LCF"), and Larned Correctional Facility ("Larned"). He states that he suffered chronic, debilitating abdominal pain

1

throughout that period, and the pain was "never addressed or diagnosed." (Doc. 3, at 2.) Plaintiff asserts that Dr. Harrod "persisted in a course of treatment known to be ineffective" and refused to refer Plaintiff to an outside specialist or order further investigation, despite Plaintiff's unresolved pain, blood loss, weight loss, anemia, and other symptoms. *Id*. at 2-3. In an attachment to the original Complaint (Doc. 1), Plaintiff asserts, "Defendant Harrod's refusal to refer to specialist where doctor did not know cause of reported extreme pain made no sense and supports deliberate indifference finding." (Doc. 1-4, at 2.) He further states, "Defendant Harrod knew that severe abdominal pain may be a symptom of several serious and potentially life-threatening conditions." *Id*.

Plaintiff further states that Dr. Wray "could have abated Plaintiff's risk of suffering a ruptured appendix at [Larned] in January of 2021, by examination at the onset of symptoms." (Doc. 3, at 3.) Plaintiff alleges that Wray ordered an abdominal x-ray on January 7, 2021. *Id*. at 6. The x-ray was performed on January 11 but was "not the type ordered." *Id*. Plaintiff was experiencing intense, unbearable pain by January 12, 2021. On January 25, 2021, Wray diagnosed him with irritable bowel syndrome with constipation but did not physically check Plaintiff's abdomen. *Id*. Plaintiff continued to experience intense pain and was unable to keep anything down. By February 2, 2021, Plaintiff states that his abdomen was swollen, the pain was unbearable, he was dizzy and incontinent, and he continued to be unable to eat or even keep medicine down. *Id*. On February 3, he was taken for an emergency CT scan, which showed that his abdominal cavity was filled with infection from a ruptured appendix and other indeterminate issues. *Id*. Plaintiff was then taken to the hospital for emergency surgery. Surgery could not be performed because of the acute infection. *Id*. Plaintiff was treated with antibiotics for five days. A repeat CT scan showed a tumor on Plaintiff's colon. *Id*. Plaintiff had surgery on February 8,

2021. A portion of his colon and small intestine was removed, along with the ruptured appendix. *Id*. After the surgery, Plaintiff experienced difficulty breathing and violent vomiting, which caused the surgical incision to reopen. *Id*. He had a second surgery on February 10, 2021, to reclose the incision. *Id*. Plaintiff alleges that Wray's delay in diagnosing and treating Plaintiff led to substantial harm through a ruptured appendix, severe pain, and acute infection. *Id*. at 3.

The Complaint brings one count titled "Deliberate Indifference." *Id*. at 4. Plaintiff names as defendants Dr. Gordon Harrod, doctor for Centurion; Dr. Robert Wray, doctor for Centurion; and Centurion. Plaintiff's request for relief seeks a declaration that his constitutional rights were violated and "nominal, compensatory and punitive damages." *Id*. at 8.

## II. The Report

The Report provides that Plaintiff was housed at the El Dorado Correctional Facility ("EDCF") from November 21, 2013, until November 18, 2020. He was transferred from EDCF to Lansing Correctional Facility ("LCF") on November 18, 2020, and remained there until December 8, 2020. He was then housed at Larned State Correctional Facility ("Larned") until February 26, 2021, when he was transferred to Hutchinson Correctional Facility ("HCF"). He remained at HCF briefly, being transferred back to Larned on March 4, 2021. He remained at Larned until April 8, 2021, when he was transferred to Ellsworth Correctional Facility ("ECF") where he remains. (Doc. 11, at 6; Doc. 11–1, at 2-3.)

The Report further states that Dr. Gordon Harrod provided the following medical care to Plaintiff while Plaintiff was incarcerated at EDCF:

> Dr. Harrod saw plaintiff on December 18, 2017, for stomach discomfort. He complained of stomach cramping and fatigue (chief complaint). Plaintiff was not in acute distress and appeared well nourished and well developed, but had been anemic the past 3-4 months. Plaintiff's hemoglobin levels dropped from 14 to 9.6 between September and December of 2017. (Exhibit 2, Para. 7-8.)

3

Dr. Harrod indicates that anemia in 55 year old plaintiff indicates possible colon cancer so medication to prevent bloating and excessive gas were continued and plaintiff was requested to undergo a colonoscopy, which was scheduled for March 14, 2018. The results were normal. Plaintiff continues to be treated for abdominal gas. Pain subsided briefly, but abdominal discomfort and fatigue continued. (Exhibit 2, Para. 9-11.)

An abdominal ultrasound was requested for plaintiff on April 10, 2018, and performed on April 16, 2018. The result was negative. (Exhibit 2, para. 12.)

On May 10, 2018, plaintiff's iron supplements were increased to two tablets twice per day to treat plaintiff's anemia and reduced energy level. (Exhibit 2, Para. 13.)

Plaintiff reported increased abdominal pain and also fatigue which prevented him from completing his workouts. On May 25, 2018, medical staff requested an Esophagogastroduodenoscopy (EGD) to be performed for diagnostic purposes. The EGD was performed on June 18, 2018. The care providers performing the EGD indicated plaintiff should also have a CT scan performed, which was done June 26, 2018. The scan showed an adrenal mass and inflammation in the large intestine. (Exhibit 2, Para. 14-16.)

Additional imaging was requested on August 7, 2018, and performed August 21, 2018. (Exhibit 2, Para. 16-17.)

The scan was reviewed by an oncologist on October 29, 2018, and nothing cancerous was identified. On November 5, 2018, plaintiff received B-12 injections once a week for four weeks, beginning November 15, 2018. (Exhibit 2, Para. 18-19.)

Because plaintiff's abdominal pain, anemia and fatigue continued, another EGD/Colonoscopy was requested on January 14, 2019, to permit analysis of any potential changes. The surgeon who performed the procedures made recommendations to continue to treat plaintiff's symptoms. (Exhibit 2, Para. 20-21.)

June 7, 2019, plaintiff met with Dr. Harrod regarding a rash on his arm. Plaintiff affirmed the B-12 shots made him feel better. Plaintiff was still slightly anemic. (Exhibit 2, Para. 22.)

Another CT scan of plaintiff's abdomen was requested June 13, 2019, to monitor changes. The scan was performed June 24, 2019. (Exhibit 2, Para. 23.)

Dr. Harrod met with plaintiff on September 12, 2019, to discuss the CT scan, which showed no significant changes. At this time, plaintiff didn't feel bad, but was still fatigued, in that exercise was becoming extremely difficult and he had difficulty breathing when walking rapidly. (Exhibit 2, Para. 24.)

>Dr. Harrod on September 27, 2019, requested an echocardiogram to be performed and plaintiff was also referred to mental health care providers. Plaintiff spoke with the mental health care provider about any mental health issues that might contribute to his feeling of fatigue. No mental health issues were identified. (Exhibit 2, Para. 25-26.)
>
>Dr. Harrod prescribed additional iron supplements for plaintiff on November 15, 2019, because they previously had provided relief. (Exhibit 2, Para 27.)
>
>Plaintiff next made sick call on May 14, 2020, complaining about abdominal discomfort, complaining about being constipated, but over all feeling better. (Exhibit 2, Para. 28.)
>
>October 2, 2020, plaintiff complained of fatigue and the iron supplement was continued. A month later on November 6, 2020, plaintiff followed up on his October visit and indicated his pain was greater after meals. Dr. Harrod placed plaintiff on a renal diet to reduce pain after meals. (Exhibit 2, Para. 29-30.)
>
>Plaintiff was then transferred to the Lansing Correctional Facility on November 18, 2020, and then to the Larned State Correctional Facility on December 8, 2020.

(Doc. 11, at 6–9; *see also* Doc. 11–2, Affidavit of Dr. Gordon Harrod.)

The Report states that Dr. Robert Wray provided the following medical care to Plaintiff while he was incarcerated at Larned:

>Plaintiff's care was discussed in a case management meeting on January 7, 2021. Dr. Wray ordered multiple tests including an x-ray of plaintiff's abdomen. Imaging showed a moderate level of stool in plaintiff's colon. (Exhibit 3, Para. 8.)
>
>Plaintiff first complained of extreme pain in his abdomen on January 12, 2021. The LSCF nurse responded to plaintiff's symptoms of nausea and vomiting. Plaintiff was placed on a clear liquid diet and a GI appointment was set for January 29, 2012. (Exhibit 3, Para. 9.)
>
>Plaintiff was next seen on January 25, 2021, as a follow up to his January 12, 2021, sick call for complaints of vomiting and nausea. Dr. Wray diagnosed plaintiff with Irritable Bowel Syndrome and prescribed prednisone. (Exhibit 3, Para. 10.)
>
>Plaintiff was seen on February 3, 2021, for a follow up on his complaint about abdominal pain. Plaintiff's vital signs were stable and he had been non-compliant with his prednisone prescription. (Exhibit 3, Para. 11.)

(Doc. 11, at 9-10; *see also* Doc. 11–3, Affidavit of Dr. Robert Wray.)

The Report also describes the grievance filed by Plaintiff and relevant correspondence. (Doc. 11, at 10-15.) Other attachments include KDOC policies and procedures, administrative regulations, and Plaintiff's medical records.

### III.  DISCUSSION

#### A.  Statute of Limitations

The statute of limitations applicable to § 1983 actions is determined from looking at the appropriate state statute of limitations and tolling principles. *See Hardin v. Straub*, 490 U.S. 536, 539 (1989). "The forum state's statute of limitations for personal injury actions governs civil rights claims under both 42 U.S.C. § 1981 and § 1983. . . . In Kansas, that is the two-year statute of limitations in Kan. Stat. Ann. § 60–513(a)." *Brown v. Unified Sch. Dist. 501, Topeka Pub. Sch.*, 465 F.3d 1184, 1188 (10th Cir. 2006) (citations omitted).

However, the Kansas Supreme Court tolled the state statutes of limitations for approximately a year in response to the COVID-19 pandemic. *See Korgan v. Estate of Hansen by and through Cramer*, 2022 WL 4465074, at *2–4 (D. Kan. Sept. 26, 2022) (finding that the statute of limitations was tolled from March 19, 2020 through April 14, 2021). The tolling or suspension is set forth in Kansas Supreme Court ("KSC") Administrative Order 2020-PR-016, as amended by KSC Administrative Order 2020-PR-32.

While state law governs the length of the limitations period and tolling issues, "the accrual date of a § 1983 cause of action is a question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Under federal law, the claim accrues "when the plaintiff has a complete and present cause of action." *Id.* (internal quotation marks and citation omitted). In other words, "[a] § 1983 action accrues when facts that would support a cause of action are or should be apparent." *Fogle v.*

*Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006) (internal quotation marks and citation omitted), *cert. denied* 549 U.S. 1059 (2006). A district court may dismiss a complaint filed by an indigent plaintiff if it is patently clear from the allegations as tendered that the action is barred by the statute of limitations. *Id.* at 1258–59; *see also Jones v. Bock*, 549 U.S. 199, 214 (2007); *Hawkins v. Lemons*, No. 09-3116-SAC, 2009 WL 2475130, at *2 (D. Kan. Aug. 12, 2009).

It appears that Plaintiff's claims accrued no later than March of 2021. If Plaintiff's claims accrued in March, 2021, he received the benefit of the KSC's suspension of the statute of limitations until April 15, 2021. On that date, the clock began to run, and the two-year limitation period expired April 15, 2023. Plaintiff filed his Complaint on February 8, 2024. It thus appears that any complained of events or acts took place more than two years prior to the filing of Plaintiff's Complaint and are time-barred. *See Fratus v. Deland*, 49 F.3d 673, 674-75 (10th Cir. 1995) (district court may consider affirmative defenses *sua sponte* when the defense is obvious from the face of the complaint and no further factual record is required to be developed). Even considering the KSC's suspension of the limitations period, Plaintiff's claims are untimely, without additional tolling.

However, Plaintiff includes the following statement in his Complaint: "Relief was sought by filing grievance on 12-13-21. All response to grievance were late. Appeal finally decided on 11-21-23." (Doc. 3, at 8.) Plaintiff also filed a copy of the December 13, 2021, grievance. (Doc. 1-3.) Plaintiff describes the nature of his complaint as follows:

> This grievance comes about because of the Deliberate indifference of Dr. Harrod, et. al, Corizon and Centurion to my serious Medical needs. I suffered chronic and severe abdominal pain for over (4) years, This condition was never diagnosed and no treatment was ever provided.

*Id.* at 1.

Plaintiff also attached two (2) additional typed pages describing the course of his abdominal complaints, starting in 2017 and continuing through the ruptured appendix, surgeries, and diagnosis of colon cancer in 2021.  *Id*. at 2-3.

The Unit Team response to the grievance is dated August 30, 2023.  It says that he needed to pursue his grievance in 2022.  *Id*. at 1.  Plaintiff appealed to the warden immediately.  *Id*.  The warden's response is dated September 12, 2023, and the response was provided to Plaintiff on September 19, 2023.  *Id*.  Plaintiff then submitted his appeal to the Secretary of Corrections on September 20, 2023.  *Id*. at 4.  The Secretary's response (titled "Unofficial-Grievance Response") is dated November 21, 2023.  *Id*. at 6-7.

The Tenth Circuit has found that it would be inequitable for the statute of limitations to run while a plaintiff is completing the exhaustion of administrative remedies required by the PLRA prior to filing suit.  *Johnson v. Garrison*, 805 F. App'x 589, 594 (10th Cir. 2020) (unpublished); *see also Battle v. Ledford*, 912 F.3d 708, 719 (4th Cir. 2019) ("[E]very circuit that has confronted a state no-tolling rule and reached this question has applied federal law to equitably toll § 1983 limitations during the PLRA exhaustion period.").  Therefore, it appears from the face of the Complaint and exhibits that the statute of limitations for Plaintiff's claims was tolled until November 21, 2023, making his Complaint timely.  This does not foreclose Defendants' raising this issue as the case proceeds.

**B.  Exhaustion**

An inmate is required by the Prison Litigation Reform Act ("PLRA") to exhaust all available prison administrative remedies before filing a complaint in federal court.  Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner

> confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (stating that under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court") (citations omitted). "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 219 (2007) (stating that "the benefits of exhaustion include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record") (citations omitted).

This exhaustion requirement "is mandatory, and the district court [is] not authorized to dispense with it." *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1167 n. 5 (10th Cir. 2003), *cert. denied*, 540 U.S. 1118 (2004); *Little*, 607 F.3d at 1249; *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (quoting *Jones*, 549 U.S. at 211)). A prison or prison system's regulations define the steps a prisoner must take to properly exhaust administrative remedies and a prisoner "may only exhaust by properly following all of the steps laid out" therein. *Little*, 607 F.3d at 1249 (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the

prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

For Kansas state prisoners, the administrative remedies require the inmate to seek an informal resolution with personnel who work with the inmate on a daily basis. K.A.R. § 44–15–101(b). If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections. K.A.R. § 44–15–101(d). The procedure to follow at each level is described in detail in the Kansas Administrative Regulations. § 44–15–102; *see also Garza v. Correct Care Solutions*, 2011 WL 2580299, at *2 (D. Kan. 2011), *aff'd* 451 F. App'x 775 (10th Cir.) (granting summary judgment for failure to exhaust claims against Correct Care Solutions where plaintiff failed to allege that he sought relief on his claims first through his unit team, then the warden, and finally from the Secretary of Corrections).

As this Court has previously found, there are two distinct avenues of administrative exhaustion established in Kansas law:

> The first avenue is found in the regulations codified by Article 15 of chapter 44 of the Kansas Administrative Regulations. These regulations govern inmate grievances covering "a broad range of matters that directly affect the inmate, including" complaints about policies and conditions of imprisonment, actions of employees and other inmates, and incidents occurring within the facility. Kan. Admin. Regs. § 44–15–101a(d)(1)(A)–(B). As the Court previously determined, this regulation applies to a constitutional claim such as the one asserted here, where the conduct complained of stems from "actions by employees" of the prison facility. *Id.* § 44–15–101a(d)(1)(B).

*Lewis v. Carrell*, 2015 WL 413640, at *2–3 (D. Kan. 2015). "The second avenue is governed by the regulations in Article 16 of chapter 44 of the Kansas Administrative Regulations." *Id.* at *3.

Kan. Admin. Regs. § 44–16–104a applies to claims for personal injury and provides: "(a) Each inmate claim for personal injury shall be submitted to the [prison] facility and [the] secretary of corrections within 10 calendar days of the claimed personal injury." *Id.* (citing Kan. Admin. Regs. § 44–16–104a).

The Kansas Court of Appeals has explained that the two sets of regulations found in Articles 15 and 16 are "separate and distinct" from one another. *Id.* (citing *Redford v. Kan. ex rel. Dep't of Corr.*, 295 P.3d 1054, 2013 WL 781102, at *6 (Kan. Ct. App. Mar. 1, 2013 (unpublished table decision)). Indeed, the regulation "expressly provides: 'The grievance procedure [in article 15] shall not be used in any way as a substitute for, or as part of, the . . . property loss or personal injury claims procedure [in Article 16] . . .'" *Id.* (quoting Kan. Admin. Regs. § 44–15–101a(d)(2); *see also Sharrock v. Stephens*, 2011 WL 5526444, at *1 (D. Kan. 2011) ("Importantly, the requirements in [§ 44–16–104a] apply regardless of whether the inmate pursues a grievance pursuant to § 44–15–101.").

The Court in *Conley* addressed defendants' argument that plaintiff failed to file a personal injury claim in a § 1983 case, and noted that while case law establishes that exhaustion of Article 15's procedures alone is not sufficient for a plaintiff to assert a personal injury claim, the Court "had not located any authority requiring an inmate to exhaust both the requirements of Article 15 and Article 16 before asserting a § 1983 claim based on an alleged violation of an inmate's constitutional rights" and declined to invent such a requirement. *Conley v. Pryor*, 2015 WL 413638, at *14 (D. Kan. 2015). However, the Court did find that exhaustion under § 44–15–101 was necessary for plaintiff's § 1983 claim. *Id.* The Court found that where plaintiff asserted a § 1983 claim for failure to provide proper dental care, plaintiff's claim constituted a complaint about the conditions of his imprisonment and the actions of employees, which requires exhaustion

11

under Kan. Admin. Regs. § 44–15–101. *Id*. Likewise, the Court in *Nunez*, stated that "an inmate who wishes to pursue both a personal injury claim and a § 1983 claim must comply with two distinct sets of administrative procedures even if he bases his claims on a single act." *Nunez v. Heimgartner*, 2017 WL 2264466, at *5 (D. Kan. 2017) (citation omitted). The Court held that "Article 15 of the KDOC regulations covers the administrative procedures that must proceed a § 1983 claim." *Id.* at *6 (citation omitted); *see also Jones v. Parks*, No. 19-cv-3175-HLT-GEB, Doc. 50 at n.3 (D. Kan. April 13, 2021) ("Plaintiff's alleged personal injury claims based off the same incidents does not exhaust his § 1983 claim.").

The Tenth Circuit has upheld the requirement that a plaintiff must comply with the requirements of § 44-15-101 prior to filing a § 1983 case, regardless of an attempt to comply with the requirements of § 44-16-104a. *See Lynn v. Kelly*, 2022 WL 1043752, at *1 (10th Cir. 2022) (unpublished) ("Mr. Lynn may have attempted to comply with the distinct requirements of § 44-16-104a, but he wholly ignored the requirements of § 44-15-101. . . . As Mr. Lynn failed to comply with the established grievance process, summary judgment was proper."); *Kidd v. Baker*, 2022 WL 17485932, at *5–6 (D. Kan. 2022) (describing the dual-track system of administrative exhaustion set out in Kansas law), *affirmed* 2023 WL 2396530 (10th Cir. 2023).

> The Tenth Circuit has explained:
>
> [T]he initial burden of proof for the exhaustion of administrative remedies in a suit governed by the PLRA "lies with the defendant." If the defendant carries this burden, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact." A plaintiff's failure to meet this burden results in the affirmative defense barring his claim and entitles the defendant to summary judgment as a matter of law.

*Moore v. Tresch*, 2022 WL 612796, at *2 (10th Cir. Mar. 2, 2022) (unpublished) (internal citations omitted). Courts in this district have found that a defendant satisfies the initial burden to show that

a plaintiff failed to exhaust administrative remedies where the defendant provides a KDOC records custodian affidavit that explains that they reviewed the grievance records and found evidence that a plaintiff availed himself of the grievance process but did not complete it. *See Lewis v. Carrell*, 2014 WL 4450147, at *10 (D. Kan. 2014) (citation omitted).

The Report in this case does not satisfy the initial burden with this type of evidence. In fact, the Report provides that "[i]t is unclear whether plaintiff has exhausted his administrative remedies since his grievance was ostensibly filed in 2021, but appears to have been lost until a copy was found in 2023. Plaintiff persisted in seeking to obtain a response on both his attempt at informal resolution and to the grievance itself for years. K.A.R 44-15-101b authorizes the grievant to proceed to the next stage of the grievance process if a timely response is not received or an agreed extension is entered into between the parties." (Doc. 11, at 17.) At most, the Report reflects the position that exhaustion is unclear. In a suit governed by the PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).

The Court is not convinced at this screening stage that Plaintiff failed to exhaust his administrative remedies. The Report does not satisfy the initial burden of showing a failure to exhaust. The exhaustion requirement extends only to the exhaustion of "available" remedies. *See Ross v. Blake*, 578 U.S. 632, 641–43 (2016). An administrative procedure may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "[I]nterference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* (citations omitted).

**C. Centurion as Defendant**

In the Tenth Circuit, "to hold a corporation liable under § 1983 for employee misconduct, a plaintiff must demonstrate the existence of the same sort of custom or policy that permits imposition of liability against municipalities under *Monell v. Department of Social Services*, 436 U.S. 658, 694 . . . (1978)." *Wishneski v. Andrade*, 572 F. App'x 563, 567 (10th Cir. 2014) (unpublished) (citations omitted). A corporation may not be held liable based upon respondeat superior because "vicarious liability is inapplicable to . . . § 1983 suits." *Rascón v. Douglas*, 718 F. App'x 587, 589–90 (10th Cir. 2017) (unpublished) (quoting *Iqbal*, 556 U.S. at 676); *see also Spurlock v. Townes*, 661 F. App'x 536, 545 (10th Cir. 2016) (unpublished); *Green v. Denning*, 465 F. App'x 804, 806 (10th Cir. 2012) (unpublished) ("An entity 'cannot be held liable *solely* because it employs a tortfeasor—or, in other words, [it] cannot be held liable under § 1983 on a respondeat superior theory.'") (citation omitted); *Williams v. Correct Care Sols.*, No. 19-3075-SAC, 2019 WL 2005920, at *2 (D. Kan. May 7, 2019); *Jefferson v. Aramark Corr. Servs.*, Case No. 17-3161-SAC, 2017 WL 6557419, at *2 (D. Kan. Dec. 22, 2017); *Livingston v. Correct Care Sols.*, Case No. 07-3256-SAC, 2008 WL 1808340, at *1–2 (D. Kan. Apr. 17, 2008) (stating that "[a] policy is a formal statement by the private corporation" and "[a] custom is a persistent, well-settled practice of unconstitutional misconduct by employees that is known and approved by the corporation.").

Plaintiff fails to state a claim against Centurion regarding his medical care. Plaintiff fails to allege a formal statement by the company or a persistent, well-settled practice of unconstitutional misconduct by employees. Plaintiff's claims against Centurion are dismissed.

**D. Medical Care**

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the

'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted). In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation omitted). A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

Plaintiff must also satisfy the subjective prong. "The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Sealock*, 218 F.3d at 1209). In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)). "A plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' but rather that the official 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer*, 511 U.S. at 842, 843 n.8).

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment. *See Estelle*,

15

429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983). However, a jury may infer conscious disregard when a prison doctor "responds to an obvious risk with treatment that is patently unreasonable." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm. *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993). In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted). "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

The Tenth Circuit recently clarified that "it is possible to have some medical care and still state a claim under the gatekeeper theory." *Lucas*, 58 F.4th at 1139. "The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Id*. (citations omitted). Under the deliberate indifference analysis, "merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability." *Id.* "Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances." *Id*. (citations omitted).

16

While the Complaint, attachments, and the medical records show that Plaintiff received some care from Dr. Harrod, Plaintiff asserts that he remained in considerable pain with unresolved symptoms for years. He argues that Dr. Harrod should have done something more at some point to diagnose and address his condition, such as referring him to a specialist. As for Dr. Wray, Plaintiff's allegations again show some care but also delayed care, again with considerable pain and permanent damage as a result.

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citation omitted). The Court "cannot resolve material disputed factual issues by accepting the report's factual findings when they are in conflict with pleadings or affidavits." *Id*. at 1109. "Furthermore, '[a] bona fide factual dispute exists even when the plaintiff's factual allegations that are in conflict with the *Martinez* Report are less specific or well-documented than those contained in the report.'" *Bellamy v. Kansas*, 2024 WL 3718065, at n.5 (10th Cir. Aug. 8, 2024) (unpublished) (quoting *Hall*, 935 F.2d at 1109).

The Court is unable to resolve the factual disputes at this stage of the proceedings and finds that this case survives screening under 28 U.S.C. § 1915A.

**E. Motion**

Also before the Court is a motion to strike (Doc. 15) filed by Plaintiff. Plaintiff asks the Court to strike the affidavits of Terry Chaput and Darcie Holthaus that are attached to the Report as "misleading and simply untrue as to the material facts of this case." *Id*. at 2. He describes in detail his objections to each affidavit.

17

The Court has considered Plaintiff's motion and taken his arguments into account in reviewing the Report and screening his Complaint. However, the Court denies the motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's motion to strike (Doc. 15) is denied.

**IT IS FURTHER ORDERED** that Plaintiff's claims against Dr. Gordon Harrod and Dr. Robert Wray survive the Court's screening under 28 U.S.C. § 1915A.

**IT IS FURTHER ORDERED** that Centurion is dismissed from this action.

**IT IS FURTHER ORDERED** that the Court will enter a separate service order for service on Defendants Harrod and Wray.

**IT IS SO ORDERED**.

**Dated December 16, 2024, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**